IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UMESH MATHUR, P.E., on his own behalf and as a shareholder, derivatively, on behalf of GAP ENGINEERING INC. | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. |
| GAP ENGINEERING INC.; GAP INSPECTION SERVICES, LLC; and MIKE M. HOMMA, MARY HOMMA, STANLEY M. KERSCH, and SANDRA KERSCH, individually, and as officers and directors of GAP ENGINEERING INC. | ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

## COMPLAINT

For his complaint against the named Defendants, Plaintiff, Umesh Mathur, P.E. ("Mathur"), states and alleges:

## NATURE OF ACTION

This is an action for violations of the federal securities laws, Texas state laws, and the common law by Defendants in connection with their sale to Mathur of GAP Engineering Inc. ("GAP Engineering") stock.

## THE PARTIES

1.      Mathur is an individual resident of Harris County, Texas, a professional engineer, and was at all relevant times, an officer, director, and shareholder in GAP Engineering. Mathur also brings this action on his own behalf and, derivatively, as a shareholder on behalf of GAP Engineering.

2.      Defendant GAP Engineering is a Texas corporation that has engaged in business in Houston, Texas and therefore is subject to the jurisdiction of this Court.

3.      Defendant GAP Inspection Services, LLC ("GAP Inspection") is a Texas limited liability company that has engaged in business in the State of Texas.

4.      Defendant Stanley M. Kersch ("Kersch") is an officer, director, and shareholder in GAP Engineering, and a member and manager of GAP Inspection.

5.      Defendant Mike M. Homma ("Homma") is an officer, director, and shareholder in GAP Engineering, and a member and manager of GAP Inspection.

6.      Defendant Mary Homma is an officer and director of GAP Engineering, serving as Treasurer (bookkeeper) and Secretary of the company.  Defendant Sandra Kersch is shown in the records of the Texas Secretary of State, as of October 7, 2007, as a director and as the treasurer of GAP Engineering.  On information and belief, neither Mary Homma nor Sandra Kersch was ever elected as a director by the shareholders of GAP Engineering, nor was either ever elected as an officer by the Board of Directors.  Mary Homma and Sandra Kersch, however, were fully aware of all the facts alleged herein, and conspired with Homma, Kersch and GAP Inspection in the wrongful acts alleged herein.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, under Texas state law, and under the common law.

8.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1367.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §78aa because this is a district in which the Defendants are found, a district in which the Defendants transact business, or a district wherein an act or transaction constituting the alleged violation of the Exchange Act occurred.

10.    In connection with the acts alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to interstate telephone communications.

## STATEMENT OF FACTS COMMON TO MULTIPLE CLAIMS

### The background of Mathur's Relationship With Kersch and Homma

11.    In 1997, Mathur joined Petrocon Systems, Inc. ("Petrocon") as a Senior Project Manager.  As a result of the successful marketing efforts of Mathur and Department Manager Warren Thompson, Petrocon was awarded three contracts worth a total worth of approximately $3.2 million.  Kersch and Homma, who were friends and who had worked together at a refining facility owned by FINA (now Alon U.S.A. Energy Inc. or an affiliate thereof) in Big Spring Texas, also joined Petrocon in 1997 and began working on projects under Mathur's direction.  A good friendship, both business and social, was formed between Mathur, Kersch, and Homma, and they continued working together for Petrocon until 2000 when Kersch and Homma left for new employment opportunities and Mathur started an independent consulting practice.

12.    Over the following six years, Mathur, Kersch and Homma remained in contact with each other.  In early 2004, Kersch and Homma formed GAP Engineering.  During 2004 and 2005, Kersch and Homma asked Mathur to write two proposals on behalf of GAP Engineering to a unit of Valero Energy Corporation ("Valero') at two Valero refinery facilities in Ardmore,

Oklahoma.   Kersch and Homma wanted to expand GAP Engineering's business into the advanced control business which was one of Mathur's areas of specialty.   Design work on advanced controls often leads to discovery of problems in basic controls, requiring initial work to be performed on basic controls (the specialty of Homma and Kersch) before work on advanced controls can be undertaken.   Thus, there was a natural fit between the two lines of business endeavors.   Mathur prepared the two proposals without compensation, at a cost of his time of at least $10,000, anticipating that these proposals would bring him work as an independent contractor for GAP Engineering.   At the time both proposals were submitted, Kersch was already on site at the Valero-Ardmore facility, working as a GAP Engineering contractor to Valero. Despite his close proximity to the client, Kersch failed to follow through adequately on the proposals, and Mathur learned months after the fact that the projects had been awarded to another company.

13.    Also in 2004, Kersch asked Mathur once again to drive up to the Valero-Ardmore facility, this time to meet Charles Archibeque, a long-time Valero employee who claimed to have ties with a private group that wanted to construct a refinery.   Mathur presented details to Archibeque concerning his expertise in refinery planning, design, and detailed engineering.

14.    In 2004, Mathur wrote another proposal for advanced control work on behalf of GAP Engineering for Valero relating to its St. Charles, Louisiana facility.   The value of Mathur's time was at least $5,000, but he charged GAP Engineering nothing.   Again, neither Kersch nor Homma maintained contact with decision makers at Valero once the proposal had been delivered, and the contract was awarded to a competitor.

15.    In July of 2006, Mathur once again took time off from his own consulting work to

visit a GAP Engineering client located in West Texas.  Receiving no compensation for either time or expenses from GAP Engineering, Mathur flew to Big Spring, Texas where he evaluated problems in existing advanced controls (propylene splitter) at the Alon U.S.A facility.  Mathur made recommendations for improvement of regulatory controls and for revamping the advanced controls.  Upon information and belief, because there was inadequate follow-up by Kersch, who was onsite at Alon U.S.A. at the time, GAP Engineering was not awarded a contract for the proposed work.

16.     In August of 2006, Mathur made a trip as an independent contractor on behalf of GAP Engineering to the Motiva Refinery in Norco, Louisiana, where Homma was working for GAP Engineering.  Mathur understood that a previous contractor had botched an operator-training simulation project at Motiva, and Homma claimed to have the in-house expertise to fix the problem.  In his on-site visit, Mathur determined that the project problems would take approximately six months to remedy.  However, Homma stated that Motiva required that the project be completed by October 2006, prior to unit start-up.  Homma did not follow Mathur's advice and hired an outside company, which company promised to complete the work quickly for Motiva under GAP Engineering supervision (not including Mathur). However, the new company could not meet the deadlines, and the project still had not been completed as of December 2007.

### The Parties Discuss Mathur's Purchase of a One-Third Interest in GAP Engineering

17.     In the summer of 2006, Kersch and Homma initiated a series of substantive discussions with Mathur regarding the potential synergies between Mathur's expertise and contacts and those of GAP Engineering.  In addition to numerous two-way and three-way

telephone conversations between Mathur, Homma, and Kersch, Mathur made two trips to Louisiana to meet with Homma and one trip to Oklahoma to confer with Kersch.  Kersch and Homma told Mathur that Mathur's decades of professional experience in advanced process control, as well as his expertise in process and equipment design, not only complemented the services then offered by GAP Engineering but also would help GAP Engineering to broaden its customer base so that it could compete as a multi-dimensional engineering services company. Homma asked Mathur if he would consider leaving his consulting practice to join GAP Engineering.  Mathur stated he would not abandon his profitable practice (which had generated billings of $253,000 in 2004 and $299,000 in 2005) unless he was made an equal "partner," that is, a one-third owner, sharing in one-third of the annual profits of GAP Engineering.

18.     In early September 2006, Homma advised Mathur that he and Kersch wanted to make Mathur a one-third owner, an officer, and a director of GAP Engineering, having equal status in all respects to Homma and Kersch.  He also advised Mathur that although the necessary legal paperwork had not yet been drawn up by GAP Engineering's corporate attorney, Mathur could "trust" them (i.e., Homma and Kersch) and should proceed with plans to make an extensive marketing trip to India on the company's behalf.  At that time, Mathur was aware of other specific project opportunities for which he could have earned fees as a consulting engineer. Mathur forewent these opportunities in express reliance upon the offer of an ownership interest in GAP Engineering and upon Homma's representation to Mathur that the latter could "trust" Homma and Kersch.

19.     By early October 2006, Mathur was still waiting for Homma and Kersch to complete the necessary legal procedures that, according to those Defendants, GAP Engineering

6

attorney Fritz Beich had outlined and that needed to be completed before Mathur could join GAP Engineering as a one-third owner.  Homma assured Mathur that he and Kersch would work out the details with Beich and schedule a special Directors' and Shareholders' meeting to pass the proper resolutions issuing shares of GAP Engineering to Mathur and electing Mathur as an officer and director.  Relying on these statements, Mathur made a marketing trip to India as a representative of GAP Engineering in charge of marketing and business development.  He was paid at the same rate that GAP Engineering was then paying Kersch and Homma on a per-hour basis.  The trip was part of a plan by Kersch and Homma to expand the scope of services offered by GAP Engineering to include general engineering services for refinery construction.

20.     During October and November 2006, Mathur talked with several companies in India, including Larsen & Toubro ("L&T"), about "partnering" with GAP Engineering in seeking large-scale jobs involving detailed refinery design, engineering, and construction of oil refineries in the U.S.  A major benefit of such a business relationship was that the work could be accomplished on a fast track because of L&T's extraordinary manufacturing capabilities and their low-cost, high-quality engineering expertise.  Homma had a connection with the Ute Indian tribe in Utah, which wanted to build a refinery on tribal lands and which would have been an ideal client for a GAP/L & T collaboration.  Mathur and Homma traveled to Utah in late December of 2006 to confer with Ute Energy, and Mathur wrote a marketing proposal.  Although the tribe ultimately decided against construction of a refinery, Mathur again expended valuable time and effort to further the economic interests of GAP Engineering.

**Mathur Purchases Shares of GAP Engineering in
Reliance on False and Misleading Statements by Kersch and Homma**

21.     On or about November 25, 2006, Kersch and Homma each represented to Mathur that Mathur had been issued shares of GAP Engineering, that he had been elected a bona fide officer and director thereof, and that he had been hired as an employee of GAP Engineering.  At a special meeting of the Board of Directors held on that date, all of the directors of GAP Engineering (i.e., Kersch and Homma) resolved unanimously that, on receipt by the corporation of the consideration to be paid for its shares, "the officers of the corporation were directed to issue to each of the persons named in the resolution the number of shares of the corporation set forth in the resolution opposite their respective names."   Only Mathur was named in the resolution.  Mathur was elected as a director, on paper, by the then-serving directors of GAP Engineering on the same date at the same meeting.

22.     Mathur tendered $1,000.00 for 1,000 shares of the capital stock of GAP Engineering on or about November 25, 2006, the same amount paid by Kersch and Homma for their shares.   Kersch and Homma represented that they had adjusted their respective share holdings at that date to reflect that each shareholder going forward -- Kersch, Homma and Mathur -- each owned 1,000 shares. The company's minute book in fact reflects that new 1,000-share certificates were to be issued to Kersch and Homma, to replace the certificates issued at the incorporation of GAP Engineering, and that a 1,000-share certificate was to be issued to Mathur. However, the subsequent actions of those Defendants have revealed that the representations to Mathur concerning Mathur's bona fide ownership interest in GAP Engineering were in fact false. Contrary to the representations of Homma, Kersch, and Beich, no share certificate was signed.  It is fair to infer from these facts that Homma, Kersch, and Mary Homma intended to keep Mathur

on the job, rendering services to GAP Engineering at rates far below the value that such services would command in the marketplace.  Mathur continued to provide these below-rate services in reliance on the fact that his foregone compensation would be more than offset by his share of company profits.  Kersch and Homma directed Mathur, consistent with the latter's assumption that he held an equity ownership interest, to market the company and obtain business.  All of the representations of Kersch and Homma were in fact a part of a design and scheme to obtain valuable services from Mathur at deeply discounted rates and to use Mathur's minority status to obtain minority-owned business contracts mandated by federal law, while secretly diverting the company profits to an entity owned by Kersch and Homma alone.  The very creation of GAP Inspection as a separate entity was an integral part of these Defendants' scheme to defraud Mathur, as more fully alleged below.  Prior to the initiation of the fraudulent scheme described herein, Kersch and Homma in fact had been using GAP Engineering as their personal "piggy bank" and had no intention of sharing profits with Mathur.

23.     Kersch and Homma also represented to Mathur in November 2006 that employment contracts were in process for all directors/officers, and that a fair buy-sell agreement, reflecting fair values of the issued and outstanding GAP Engineering shares, would be provided for the owners and their spouses to sign.  Such representations were false at the time they were made.  Kersch and Homma already were in the process executing their plan to exclude Mathur from management decision-making and from sharing in the profits of GAP Engineering.

24.     Kersch and Homma misled Mathur to believe that his shares in GAP Engineering represented a bona fide profits interest in the company -- and that profits would be distributed to him in the ordinary course -- not only for the purpose of inducing Mathur to render discounted

professional services, but in order to give GAP Engineering an advantage in obtaining contracts. Mathur is of Indian descent and has been a naturalized U.S. citizen for over 30 years. Kersch and Homma believed that Mathur's putative ownership interest would allow GAP Engineering to compete for "minority-owned" business contracts. Homma, an American citizen of Japanese descent, and Kersch previously had attempted without success to represent GAP Engineering as a minority-owned and operated business, even though Homma had been issued a few more shares of stock than Kersch.

### Homma and Kersch Refuse Access to GAP Engineering Books and Records

25.     From the date that he purchased his shares in GAP Engineering, Homma and Kersch have denied Mathur access to the books and records of GAP Engineering, even though most of those records were "online" and could have been accessed by Mathur if he had been provided with the password. The password was never provided to Mathur, despite his repeated requests. After Mathur purchased his shares of GAP Engineering, Kersch and Homma continued to operate GAP Engineering as *a de facto* partnership of those two shareholders as they had previously done and withhold basic financial and corporate information from Mathur, all with the intent of assuring that Mathur would not discover the Defendants' misrepresentations, omissions, and financial irregularities.

26.     In December 2006, one month after he became a director, Mathur attended a meeting with Jacob Goodman ("Goodman"), the GAP Engineering accountant, along with Kersch, Homma, and Mary Homma, who conducted basic in-house bookkeeping for the company. Goodman expressed anger about the practices of Homma and his wife, who had been living in Louisiana for more than a year, and who had been billing all of their personal living

expenses to GAP Engineering as business expenses.  Goodman advised the Hommas that these practices violated IRS rules.  Soon thereafter, Goodman resigned as the GAP Engineering accountant.

27.     At the December meeting with Goodman, Mathur asked to see the books and other financial records of GAP Engineering.  Goodman evaded the request, stating that he did not have time, due to end-of-year tax work, to show Mathur the records.  In addition, the accountant stated that the records were incomplete at that time.  Mathur again asked Kersch for access to financial records in March 2007, but again was denied access.

**Homma and Kersch "Cash Out" the Company's**
**Credit Line and Pay All of the Proceeds to Themselves**

28.     Homma and Kersch advised Mathur in early January 2007 that they had cashed out GAP Engineering's $50,000 credit line with Chase Bank on the advice of Goodman, claiming that the $50,000 credit line would be treated by the IRS as end-of-year taxable cash. Homma and Kersch split the $50,000 bank advance between themselves as profit without consulting Mathur, even though the resulting debt obligation obviously would affect the value of Mathur's shares equally and would reduce profits in later accounting years.  No Board of Directors approval for the action described in this paragraph was sought or obtained, nor was Mathur even consulted about these actions.

29.     As a result of a "cash crunch," none of the three owners of GAP Engineering received any salary for the last week of December 2006 and for the entire month of January 2007.  Mathur was not forewarned of this problem.  Homma and Kersch told Mathur that they had been forced to loan their "bonus money" back to GAP Engineering in order to meet payroll. Homma and Kersch, and employees of GAP Engineering acting at their direction, denied Mathur

11

access to financial records that would have allowed him to verify the truth or falsity of these representations.

**Homma Advises Mathur that**
**GAP Engineering has Ample Work for the "Next Five Years"**

30.     GAP Engineering had an ongoing contract with a company called Motiva for a safety system for two refinery units in Norco, Louisiana.  In early 2007, Homma, who was working there full-time, asked Mathur to come to Louisiana and assist with that work because Homma was short-staffed.  Homma specifically directed Mathur to cease his marketing and business development duties, representing to Mathur that GAP Engineering had "enough work for the next five years."  In reliance upon these representations, Mathur continued to work full-time for GAP Engineering in Louisiana, notwithstanding an offer of employment at a much higher salary at Rohm and Haas, an East Texas chemical company.  Then, on December 2, 2007, Homma told Mathur that he had been terminated.  On information and belief, the Board of Directors did not act to terminate Mathur, and Mathur received no distribution of any profits earned by GAP Engineering during 2007.

**Homma and Kersch Use GAP Inspection as a Device to**
**Divert Profits From GAP Engineering and to Deprive Mathur of His Profit Share**

31.     In 2007, Homma and Kersch told Mathur that, in January of that year, Kersch had been approached by a group of individuals who had been performing non-destructive testing and inspection work at a Valero site.  The group wanted to contract out their services through GAP Engineering Inc.  After discussion, Homma, Kersch and Mathur agreed that these individuals would become part of GAP Engineering and would perform refinery inspection work as a division of Gap Engineering Inc.  The name of "GAP Inspection Services" was used for this

group, which was described as a "division" of GAP Engineering on the company website, in internal company document, and in the company organizational chart.

32.     In February 2007, Valero's Dumas, Texas refinery experienced a major fire and Valero immediately needed the services of GAP Engineering's inspection department.   GAP Engineering sent a proposal to Valero to contract out its inspection employees to Valero.   GAP Engineering employees, soon numbering more than thirty, were sent to work for Valero-Dumas pursuant to a written "Work Agreement" between Valero and GAP Engineering dated February 21, 2007 (the "Valero Contract").   All of the references in the Valero Contract, including rate quotes, refer to GAP Engineering.   There is no reference in the Valero Contract to "GAP Inspection" or "GAP Inspection, LLC."

33.     Unbeknownst to Mathur, in early May 2007, Homma and Kersch formed GAP Inspection as a separate Texas limited liability company, with the two of them as the sole members.   Those Defendants then began transferring funds from GAP Engineering accounts to GAP Inspection.   Mathur discovered the existence of GAP Inspection only after he putatively had been terminated from employment at GAP Engineering in December 2007.   After demanding financial records for over a year to no avail, Mathur obtained an edited copy of GAP Engineering's general ledger.   That ledger shows that amounts in excess of $3 million were received from Valero for the services described in the preceding paragraph.   Kersch and Homma secretly caused at least $1.3 million of Valero payments to be transferred from GAP Engineering to GAP Inspection.   Kersch and Homma concealed the fraudulent transfers from Mathur in an attempt to deprive Mathur of his share of profits from the Valero contract.

**Homma and Kersch Disavow Their Buy/Sell Promises and Obligations**

34.     In connection with their offer of shares in GAP Engineering to Mathur, and to induce Mathur to purchase shares and contribute his "sweat equity" to the company, Homma and Kersch repeatedly represented that the shareholders would enter into a buy/sell agreement that would fairly value the shares of GAP Engineering.   GAP Engineering counsel prepared a buy/sell agreement valuing the company's shares at $500 per share.   That agreement was executed by Homma, Mathur and their spouses, as contemplated by all parties, then sent to Kersch for his signature and that of his wife, as also contemplated by all parties.   Mathur later asked Homma whether the buy/sell agreement had been signed.   Homma told Mathur that Kersch had refused to sign it because Kersch did not agree to the share valuation set forth in the document.   When the defendants finally produced a purported copy of the agreement, after many prior requests had been refused or ignored, the document revealed that Kersch and his wife had signed the agreement but that Kersch had made handwritten notations on the valuation page annexed to the agreement.   The notes were to the effect that Kersch's signature was binding only if the shares were valued at $1.00.   Homma and Kersch have now disavowed any obligation to pay Mathur more than the par value price of $1.00 per share and have refused to tender a share price that fairly reflects the actual value of the shares, taking into account, *inter alia*, the $3 million Valero receipts that were wrongfully diverted from the company.

35.     Homma and Kersch not only have refused to buy out Mathur at a fair price but also have purported to terminate him as an officer and employee and as a director of GAP Engineering.   Those actions, along with the wrongful diversion of revenue from GAP Engineering to GAP Inspection, have rendered the entire basis of Mathur's investment in GAP

Engineering a nullity.  Homma and Kersch now claim that GAP Engineering has a negative net worth and hence that Mathur's shares have no value.  On information and belief, the restoration of the wrongfully diverted Valero funds would result in a positive share valuation.

## CLAIMS FOR RELIEF

### COUNT I:  VIOLATIONS OF SECTION 10(B) AND RULE 10B-5 THEREUNDER

36.     Mathur repeats and realleges the allegations set forth in paragraphs 1 through 35 above, as though fully set forth herein.

37.     This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Claim is based upon materially false and misleading statements and omissions of material fact made by the Defendants.

38.     Defendants made the false and misleading statements recounted herein.  Such statements were false and misleading in that they contained material misrepresentations, or failed to disclose material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Such knowing statements and omissions include:

(a)     In September 2006, Homma and Kersch (collectively in this paragraph 38, "Defendants") told Mathur that they had a plan to make Mathur a full, one-third owner and a fully participating principal in the management and in the profits of GAP Engineering, having equal status in all respects to Homma and Kersch.  There was in fact no such plan and the Defendants' actions since discovered, as alleged in the Statement of Facts, compel the inference that the actual intention motivating Defendants' actions was the intention (i) to obtain valuable services from Mathur at deeply discounted rates and (ii) to use Mathur's minority status to

15

secure "minority-owned-and-operated" business contracts.

(b)     On or about November 25, 2006, Defendants each represented to Mathur that Mathur had been issued shares of GAP Engineering, that he had been elected a bona fide officer and director thereof, and that he had been hired as an employee of GAP Engineering. Defendants caused corporate minute book records to be created that reflected these actions, as is more fully alleged in the Statement of Facts.  Defendants' statements were false and the minute book records were a pure sham designed to keep Mathur "on the job" in the belief that he had purchased a bona fide, one-third profits interest in the company.  The facts, *viz*, (i) the Defendants' failure ever to share profits with Mathur while improperly paying themselves cash drawn on the company's bank credit line and (ii) the Defendants' systematic diversion of revenue to another shell entity owned only by them, compel the inference that Defendants' intentionally led Mathur to believe that he was a real owner of GAP Engineering.  The actual facts were that the Defendants were then continuing to operate GAP Engineering as their personal piggy bank to the exclusion of Mathur's putative ownership rights.

(c)     Defendants represented on November 25, 2006 that they had adjusted their respective share holdings in GAP Engineering to reflect that each shareholder going forward -- Kersch, Homma and Mathur -- each owned 1,000 shares. The company's minute book in fact reflects that new 1,000-share certificates were to be issued to Kersch and Homma to replace the certificates issued at the incorporation of GAP Engineering, and that a 1,000-share certificate was to be issued to Mathur.  However, the Defendants' subsequent actions compel the inference that the stock-book entries were a sham and that the Defendants statements were intentionally false.  In truth, Defendants knew that they were continuing on that date to operate the company

as a de facto partnership between Kersch and Homma alone to the exclusion of Mathur's putative rights.  All doubt about the reality of the ownership was revealed as the Defendants took actions to line their own pockets at the expense of Mathur and the company *qua* company. These actions compel the inference that the Defendants' statements about sharing profits on a one-third/one-third/one-third basis was knowingly false and intended to induce Mathur to remain on board so that the Defendants could benefit from discounted work and falsely represent to third parties that GAP Engineering was a  minority-owned-and-operated business.

(d)     The Defendants deliberately failed to inform Mathur of the financial irregularities and problems that already afflicted GAP Engineering in November 2006, including improper accounting for personal expenses as business expenses (thereby exposing the company to adverse taxing authority actions that could materially affect the value of the shares theoretically issued to Mathur) and, more generally, the overall failure to treat the company as a separate, *bona fide* entity rather than as a personal slush fund for the two owners.  Had Mathur known of these irregularities, which continued unabated after November 2006 to Mathur's great detriment, Mathur would not have purchased the GAP Engineering shares.  The very pattern of the Defendants' actions before and after the sham stock transaction with Mathur compels the inference that Defendants fully intended to withhold the negative information and thereby to induce reliance by Mathur.

(e)     In connection with their offer of shares in GAP Engineering to Mathur and to induce Mathur to purchase shares and contribute his "sweat equity" to the company, Homma and Kersch repeatedly represented that a reasonable buy-sell agreement, setting forth *bona fide* share values, was in the works.   Such information was very important to Mathur and indeed was one

of the conditions of his purchase of GAP Engineering stock.   Kersch's subsequent actions compel the inference that this representation, while true in the most pedantic or technical sense (company counsel was preparing *a form of* buy/sell agreement), was pure artifice.   Kersch's later refusal -- a refusal that was baseless by any objective assessment -- to sign off on a bona fide valuation of the company's shares reveals what his true intent had been in November 2006.   The real intent was to preserve the ownership *status quo* while leading Mathur to believe that Mathur was a *bona fide* owner with bona fide rights that would be cashed out at a fair value if and when the shareholder/owners of  GAP Engineering parted ways.

39.     Defendants violated Section 10(b) of the Exchange Act and Rule 10(b)-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Mathur.

40.     Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce, engaged and participated in a continuous course of conduct to conceal material information as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Mathur.

41.     The material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing the true facts regarding GAP Engineering and its financial situation and prospects and so that GAP Engineering and the individual Defendants would benefit financially as a result of the scheme.

42.      As a result of making such affirmative statements, or participating in the making of such affirmative statements, GAP Engineering and the individual Defendants had a duty to speak fully and truthfully regarding such representations and to promptly disseminate any other information necessary to make the statements made, in the light they were made, not misleading.

43.      By reason of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

44.      At the time Defendants made the misrepresentations and omissions referred to above, Mathur was ignorant of their falsity, and believed them to be true. Mathur actually and justifiably relied on the Defendants' misrepresentations and omissions, and as a direct and proximate result of them, Mathur purchased the common stock of GAP Engineering and was damaged thereby.

45.      Mathur would not have purchased GAP Engineering common stock at all, had he been aware of the Defendants' false and misleading statements.

46.      As a direct and proximate result of Defendants' wrongful conduct, Mathur has suffered damages in connection with his purchase of GAP Engineering's common stock.

## COUNT 2:  COMMON LAW FRAUD

47.      Mathur repeats and realleges the allegations set forth in paragraphs 1 through 46 above, as though fully set forth herein.

48      In connection with the Defendants' sale of the common stock of GAP Engineering, the Defendants made, and participated in making, material misrepresentations of presently existing fact or material omissions described in the paragraphs above.

49.     Defendants made these representations knowing that they were false at the time that Defendants made them, or in reckless disregard to their truth or falsity, and with the purpose and intent to induce Mathur to purchase the common stock of GAP Engineering.

50.     Mathur had a right to rely upon Defendants' representations, and Mathur, in fact, actually and reasonably relied upon the truth of these false representations of fact and omissions to his detriment in purchasing the common stock of GAP Engineering, in rendering services to GAP Engineering at far below market rates, and in foregoing other employment opportunities to devote his efforts to GAP Engineering projects.

51.     Mathur relied upon Defendants' representations in ignorance of their falsity.

52.     As a direct and proximate result of Mathur's reliance on these misrepresentations and omissions, Mathur has suffered and continues to suffer damages in an amount to be determined at trial.

53.     Defendants' actions have been willful, malicious, and/or have manifested a knowing and reckless indifference toward and a disregard of the rights of Mathur.

## COUNT 3:  CONSPIRACY TO DEFRAUD AND AIDING AND ABETTING FRAUD

54.     Mathur repeats and realleges the allegations set forth in paragraphs 1 through 53 above, as though fully set forth herein.

55.     In early 2007, Homma, Kersch, Sandra Kersch, and Mary Homma decided on a plan to keep Mathur as employee of GAP Engineering but to deprive him of his shares in the profits of the company.

56.     They decided to keep this decision secret from Mathur, knowing that to do so was fraudulent and contrary to the November 26, 2006 action of the Board of Directors of GAP

Engineering.

57.     Later on, after GAP Inspection was formed, that company joined the conspiracy through its members and managers, Homma and Kersch, and deprived Mathur of the profits of the Valero contract by transferring those profits to GAP Inspection.

## COUNT 4:  NEGLIGENT MISREPRESENTATION

58.     Mathur repeats and realleges the allegations set forth in paragraphs 1 through 57 above, as though fully set forth herein.

59.     In connection with the Defendants' sale of the common stock of GAP Engineering, the Defendants made, and participated in making, material misrepresentations of presently existing facts described in the paragraphs above.

60.     Defendants made these representations knowing that they were false at the time that Defendants made them, or in reckless disregard to their truth or falsity, or negligently or carelessly, without exercising reasonable care or competence in obtaining or communicating the information to Mathur.

61.     Each of the Defendants had a pecuniary interest in Mathur's purchase of GAP Engineering's common stock because, among other things, each of the Defendants was a seller of the stock.

62.     By virtue of their positions as officers and/or directors of GAP Engineering, their ownership of a controlling interest in GAP Engineering's common stock, and their participation in and knowledge of GAP Engineering's operations, the Defendants were in a superior position to know the material facts.

63.     Defendants should have reasonably foreseen that Mathur was likely to rely upon their misrepresentations of fact described in the paragraphs above.

64.     Mathur actually and reasonably relied upon the truth of these false representations in purchasing the common stock of GAP Engineering.

65.     As a direct and proximate result of Mathur' reliance on these representations, Mathur has suffered and continue to suffer damages in an amount to be determined at trial.

66.     Defendants' actions have been willful, malicious, and/or have manifested a knowing and reckless indifference toward and a disregard of the rights of Mathur.

## COUNT 5:  SHAREHOLDER OPPRESSION

67.     Mathur repeats and realleges the allegations set forth in paragraphs 1 through 66 above, as though fully set forth herein.

68.     Mathur is a minority shareholder in GAP Engineering, a close corporation.

69.     The conduct of Homma and Kersch, majority shareholders, substantially defeated the minority's expectations that, objectively viewed, were both reasonable under the circumstances and central to Mathur's decision to join GAP Engineering.

70.     Homma and Kersch unfairly dealt with Mathur, a minority shareholder, maliciously suppressed payment of dividends and/or bonuses to Mathur, used corporate funds for personal expenses and their personal benefit, and employed "squeeze out" techniques such as diverting corporate opportunities, making excessive payments to themselves through fraudulent transfer of funds to GAP Inspection, and attempting to deprive Mathur of the value of his shares.

71.     The conduct of Homma and Kersch has been burdensome, harsh, and wrongful, evidencing a lack of probity and fair dealing in the affairs of GAP Engineering, as well as a

visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely, to the prejudice and damage of Mathur.

### COUNT 6:  FRAUD IN THE MANAGEMENT OF GAP ENGINEERING

72.     Mathur repeats and realleges the allegations set forth in paragraphs 1 through 71 above, as though fully set forth herein.

73.     Material false representations were made to Mathur concerning the relationship of GAP Inspection to GAP Engineering and that GAP Inspection was to be a division of GAP Engineering.

74.     When the representations were made, Homma and Kersch knew that those representations were false and made them recklessly without any knowledge of the truth and as a positive assertion.

75.     The representations were made with the intention that they be acted upon by Mathur.

76.     Mathur acted in reliance upon the representations and suffered damages thereby.

### COUNT 7:BREACH OF FIDUCIARY DUTY OF LOYALTY
### (Tex. Business Organizations Code § 21.418)

77.     Mathur repeats and realleges the allegations set forth in paragraphs 1 through 76 above, as though fully set forth herein.

78.     Mathur has standing to bring this claim on behalf of GAP Engineering, derivatively, and as a shareholder and a person who was a director at the time of the transactions at issue.

79.     Homma and Kersch caused GAP Engineering to transfer a substantial portion of the assets of GAP Engineering to GAP Inspection.   Such transfer was invalid under Tex.

23

Business Organizations Code § 21.418 because GAP Inspection is an entity in which two of the officers and directors of GAP Engineering (Homma and Kersch) are managerial officials, and in which they have a financial interest, because:

(a)     The material facts as to the relationship or interest and as to the transaction were not disclosed to or known by the full board of directors, as required by § 21.418;

(b)     The transaction was not presented in good faith for the affirmative vote of Mathur, the sole disinterested director of GAP Engineering, as required by § 21.418;

(c)     The transaction was not presented in good faith to a vote by all of the shareholders of GAP Engineering, as required by § 21.418; and

(d)     The transaction was not fair per se (i) because it was never authorized, approved, or ratified by the full board of directors or the shareholders of GAP Engineering, as required by § 21.418, and (ii) because the transaction was, by any objective measure, unfair to the corporation, in that the bulk of the company's cash assets were transferred without consideration or equivalent value.

80.     GAP Engineering is entitled to return of all monies wrongfully transferred to GAP Inspection, with prejudgment interest.

### COUNT 8: QUANTUM MERUIT AND UNJUST ENRICHMENT: GAP ENGINEERING

81.     Mathur repeats and realleges the allegations set for in paragraphs 1 through 80 above, as though fully set forth herein.

82.     Mathur rendered valuable services to GAP Engineering which were accepted, used, and enjoyed by GAP Engineering.

83.      GAP Engineering was reasonably notified that Mathur expected to be paid a fair wage for his services.

84.      GAP Engineering decided to exclude Mathur from receiving the profits of the company, and continued to pay him less than the hourly rate he normally charged for his engineering services.  GAP Engineering was unjustly enriched by those actions.

## COUNT 9:  BREACH OF COMMON LAW
## FIDUCIARY DUTY TO GAP ENGINEERING

85.      Mathur repeats and realleges the allegations set for in paragraphs 1 through 84 above, as though fully set forth herein.

86.      Mathur has standing to bring this claim derivatively on behalf of GAP Engineering.

87.      As officers and directors, Homma, Kersch, Mary Homma and Sandra Kersch (if indeed the latter two Defendants are bona fide officers and/or directors of GAP Engineering) owed a fiduciary duty to GAP Engineering.  By the actions alleged herein, those Defendants breached their fiduciary duties to GAP Engineering.  GAP Engineering was damaged thereby in an amount to be established at trial.

## COUNT 10: BREACH OF FIDUCIARY DUTY TO GAP ENGINEERING
(Tex. Bus. Corp. Act art.5.10)

88.      Mathur repeats and realleges the allegations set forth in paragraphs 1 through 87 above, as though fully set forth herein.

89.      The transfer of a substantial portion of the assets of GAP Engineering to GAP Inspection was a transfer which required approval of two-thirds of the shareholders entitled to vote pursuant to Art. 5.10 of the Texas Business Corporation Act.

90.     Article 5.10 was violated in that the required approval of two-thirds (2/3) of the shareholders entitled to vote was not obtained.

91.     The failure to obtain shareholder approval constitutes a breach of fiduciary duty owed by Homma and Kersch to GAP Engineering.

92.     GAP Engineering was damaged by the actions of Homma and Kersch.

**COUNT 11:   SHAREHOLDER DERIVATIVE SUIT, CLOSE CORPORATION**

93.     Mathur repeats and realleges the allegations set forth in paragraphs 1 through 92 above, as though fully set forth herein.

94.     GAP Engineering is a close corporation in that its shares are not listed on an exchange or otherwise traded publicly, shareholders participate in its management, and it otherwise qualifies as a close corporation under Texas statutory and common law.

95.     Mathur is a minority shareholder in GAP Engineering, and is qualified to represent the interests of GAP Engineering in that he did not participate in any of the alleged wrongdoing by Homma, Mary Homma, Kersch, and Sandra Kersch.

96.     Homma, Mary Homma, Kersch and Sandra Kersch (assuming that Sandra Kersch was in fact elected as treasurer of GAP Engineering) violated their fiduciary duties in the management of GAP Engineering by refusing to declare dividends or shares of the profit in 2007, siphoning off profits through excessive salaries, rents, or interest; manipulations of related companies also controlled by majority of GAP Engineering officers, directors, and shareholders; and failing to diligently seek to obtain the benefit of corporate opportunities provided by Mathur.

97.     GAP Engineering and Mathur were damaged by the actions alleged in this Count; and any damages awarded on this claim should be awarded to Mathur, for the reason that GAP

Engineering officers and directors who breached their fiduciary duties should not benefit thereby through GAP Engineering.

### COUNT 12:  FRAUDULENT TRANSFER

98.     Mathur repeats and realleges the allegations set forth in paragraphs 1 through 97 above, as though fully set forth herein.

99.     Homma and Kersch transferred substantially all monies owed to GAP Engineering and Mathur as a creditor of GAP Engineering with actual intent to hinder, delay, or defraud Mathur without receiving a reasonably equivalent value in exchange for the transfer or obligation and without the knowledge of Mathur.

100.     Homma and Kersch knew or reasonably should have known that GAP Engineering intended to incur or would incur debts beyond its ability to pay as they became due.

101.     Homma and Kersch retained control of the assets of GAP Engineering after the transfer to GAP Inspection.

102.     The fraudulent transfers rendered GAP Engineering insolvent.

### COUNT 13:  BREACH OF FIDUCIARY DUTY BETWEEN DIRECTORS AND SHAREHOLDERS: HOMMA, KERSCH AND GAP INSPECTION

103.     Mathur repeats and realleges the allegations set forth in paragraphs 1 through 102 above, as though fully set forth herein.

104.     GAP Engineering, with three to five shareholders, officers, and directors, operated more as *a de facto* close corporation or partnership than a corporation. Homma and Kersch retained exclusive control over all aspects of the corporation, excluding Mathur from any meaningful role in management or financial matters concerning GAP Engineering.

105.    The duty existing between Homma and Kersch as controlling directors and shareholders and Mathur as the minority shareholder is the same as the duty between partners: the duty of highest good faith and loyalty.

106.    Mathur joined GAP Engineering as a director and shareholder in order to participate personally in its management and to receive a one-third share of its profits.

107.    Mathur understood that employment by GAP Engineering went hand-in-hand with stock ownership.

108.    Mathur's termination of employment by GAP Engineering was accompanied by an offer to purchase his shares of stock at a price which failed to reflect the monies earned by GAP Engineering (and fraudulently transferred to GAP Inspection Services, as Mathur subsequently discovered).  Mathur's termination occurred in December 2007, just before any end-of-year distribution of profits ought to be made.

109.    Homma and Kersch willfully and intentionally breached their fiduciary duty to Mathur and they conspired to, and attempted to, pressure Mathur to sell his stock for which there was no market and which had little value after the fraudulent transfer of the income of GAP Engineering to GAP Inspection.

110.    Mathur received no salary as a director and received one bonus in December 2006 of $4,500.00, while the other two directors paid themselves large bonuses that included  in 2006 the sum of $25,000.00 to each of them borrowed from the company's bank.  No dividends were declared while Mathur was a shareholder.

111.    Mathur was injured by the breach of fiduciary duty in that his salary and his positions as vice-president and director clearly resulted therefrom.   Because no buy-sell

agreement was ever signed by all the directors, Mathur had no reason to expect he would be able to sell his shares for a higher price than he paid, meaning the value of his investment was tied directly to his employment.  By terminating his employment, Mathur was cut off from company benefits.  By failing to make a fair offer for his shares of stock, and Mathur having no opportunity to sell to another buyer, Homma and Kersch essentially cut Mathur off from company benefits, breaching their fiduciary duty to him.

112.    GAP Inspection knowingly conspired and participated in the breach of fiduciary duty to Mathur, and is liable as a joint tortfeasor with Kersch, Sandra Kersch, Homma,  and Mary Homma.

## COUNT 14:  FRAUDULENT INDUCEMENT

113.    Mathur repeats and realleges the allegations set forth in paragraphs 1 through 112 above, as though fully set forth herein.

114.    The Defendants made material representations to Mathur concerning his equal right to the profits of GAP Engineering, thereby inducing him to work for GAP Engineering at a discounted hourly rate, far below what he was earning as a self-employed independent contractor.

115.    The representations described in the preceding paragraph were false.

116.    When the representations were made, the Defendants knew they were false or made them recklessly without any knowledge of the truth and as a positive assertion.

117.    The representations were made willfully and maliciously and with the intent that Mathur should act upon them.

118.     Mathur acted in reliance on the representations and was damaged thereby, including but not limited to his rejection of employment with Rohm and Haas at the very time that Kersch and Homma were siphoning off income from GAP Engineering into GAP Inspection and their own pockets.

## COUNT 15:  CLAIM FOR APPOINTMENT OF RECEIVER

119.     Mathur repeats and realleges the allegations set forth in paragraphs 1 through 118 above, as though fully set forth herein.

120.     In or about the month of November 2006, Mathur purchased a one-third interest in GAP Engineering in the form of shares of stock for the purpose of engaging in the business of oil refinery engineering.

121.     Mathur, the individual Defendants, and GAP Engineering orally agreed that Mathur would serve as marketing director and vice-president of GAP Engineering in return for a salary and one-third interest in the net profits of GAP Engineering.

122.     Mathur duly performed the conditions required to be performed on his part and indeed GAP Engineering ought to be profitably operating in Texas and Louisiana.

123.     Although GAP Engineering has earned substantial net profits to the date hereof, believed to be in excess of $2 million, these profits have been secretly and wrongly transferred to GAP Inspection, which entity was created solely to hide such profits from Mathur for the sole benefit of Kersch and Homma.

124.     Defendants GAP Engineering, Kersch and Homma have failed and refused to account to or divulge the amount of said profits or the details of said business to Mathur, although duly demanded.  Upon information and belief, GAP Inspection, Kersch and Homma

have wrongly retained the profits of GAP Engineering and have neglected and refused to pay to Mathur his share thereof, although duly demanded.

125.    Defendants have denied Mathur full access to the books and records of GAP Engineering, although duly demanded.

126.    At a recent shareholders' meeting, Defendants purported to remove Mathur as a director of GAP Engineering and they have refused him access the offices of GAP Engineering.

127.    Defendants have diverted substantial revenues belonging to GAP Engineering that constitute assets thereof, and the individual Defendants have diverted the same to their own personal use and benefit and, with the benefit of the wrongfully transferred assets of GAP Engineering, have commenced and are operating GAP Inspection services and potentially other businesses for their own personal and exclusive use and benefit.

## PRAYER FOR RELIEF

WHEREFORE, Mathur prays for judgment as follows:

1.    That Mathur be adjudged a holder of one-third interest in the assets and profits of GAP Engineering and GAP Inspection;

2.    That an accounting be taken of all the deals and transactions from November 26, 2006 and of the monies received and paid to the Defendants;

3.    That the assets of GAP Engineering and GAP Inspection utilized and employed by Homma and Kersch for their personal business and use, including the funds of GAP Inspection, be declared and found to constitute a trust fund for the benefit of GAP Engineering, and that the Defendants be required to account therefore and the profits therefrom;

4.      That a Receiver of the property, rights, and good will of GAP Engineering and GAP Inspection be appointed with power to collect all debts for the benefit of all parties entitled thereto and to conserve the assets of GAP Engineering and GAP Inspection, and that his fees and costs be paid by the Defendants;

5.      That the profits of GAP Engineering be disgorged from and GAP Inspection, Kersch, and Homma and that Mathur recover one-third of said profits and the costs of this action.

6.      That Mathur be awarded compensatory damages against all Defendants for all damages sustained as a result of Defendants' wrongdoing in an amount to be determined at trial, including pre and post-judgment interest thereon;

7.      That Mathur be awarded punitive damages for Defendants' conduct that has been willful, malicious, and/or has manifested a knowing and reckless indifference toward and a disregard of the rights of Mathur.

8.      That Mathur be awarded his reasonable costs and expenses incurred in this action, including attorneys' and expert witness fees and other costs; and

9.      That the Court award such other and further relief as the Court may deem just and appropriate.

## **JURY DEMAND**

Mathur demands a trial by jury as to all issues so triable.

Respectfully submitted,

ABRAMS SCOTT & BICKLEY, L.L.P.


By: /s/ Robert Scott
        Robert Scott
        State Bar No. 17911800
        Federal  ID No. 3085
        Bank of America Building, Suite 4000
        700 Louisiana Street
        Houston, Texas 77002
        (713) 228-6601
        (713) 228-6605 (fax)
        Email: rscott@asbtexas.com

        Attorney-in-Charge for Plaintiff

OF COUNSEL:

ABRAMS SCOTT & BICKLEY, L.L.P.

Marquel R. Sautural
State Bar No. 24041870
Federal ID No. 596955
Bank of America Building, Suite 4000
700 Louisiana Street
Houston, Texas 77002
(713) 228-6601
(713) 228-6605 (fax)
Email: msautural@asbtexas.com

PINKERTON & FINN, P.C

Judith A. Finn (Okla. Bar No. 2923)
J. David Jorgenson (Okla. Bar No. 4839)
Penthouse Suite
15 E. 5th Street
Tulsa, Oklahoma 74103-4303
(918) 587-1800